NO. 07-02-0019-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL A



FEBRUARY 13, 2002



______________________________




VICKIE DIANNE GRAY, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE CRIMINAL DISTRICT COURT OF JEFFERSON COUNTY;



NO. 57941; HONORABLE CHARLES D. CARVER, JUDGE



_______________________________



Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

ON ABATEMENT AND REMAND


 Appellant Vickie Dianne Gray challenges her conviction for the offense of securing
execution of a document by deception and the resulting sentence of two years confinement
in the Institutional Division of the Department of Criminal Justice. Sentence was imposed
on November 13, 2001, and the record was therefore due to be filed no later than January
14, 2002. We have received the clerk's record, but have not received the reporter's
record. By letter dated January 15, 2002, we notified the court reporters that the record
had not been filed and, in the event it could not be immediately filed, the reporters should
request an extension of time by filing a reporter's request form within ten days. No
response has been received to that letter. Therefore, we abate this appeal and remand
it to the Criminal District Court of Jefferson County for a hearing. See Tex. R. App. P.
37.3(a)(2). 

 Upon remand, the judge of the trial court shall immediately cause notice to be given
and conduct a hearing to determine whether appellant has abandoned her appeal or if she
still desires to pursue her appeal. In the event appellant still desires to prosecute her
appeal, the court shall determine why the reporter's record has not been filed and whether
any further steps need to be taken to facilitate the provision of an appellate record and the
completion of the record for appellate review.

 In support of its determination, the trial court shall prepare and file its findings and
orders and cause them to be included in a supplemental clerk's record. The hearing
proceedings shall be transcribed and included in a supplemental reporter's record. Those
supplemental records shall be submitted to the clerk of this court no later than March 18,
2002. 

 It is so ordered. 

 Per Curiam 



m. App. 2004). Indeed, there are times when the only
evidence indicative of guilt is circumstantial, such as in cases like that at bar. For instance,
to secure a lawful conviction, it was encumbent upon the State to prove appellant
exercised control, management, or care over the substance while knowing it to be
contraband. Poindexter v. State, 153 S.W.3d at 405-06 (describing the elements of the
crime at issue as exercising control, management, or care over the contraband while
knowing it to be contraband). While the record at bar is replete with direct evidence of the
first element (as evinced by appellant driving the contraband across country), no such
evidence illustrates that he knew of the marijuana. 

 So, the legitimacy of the verdict depends upon whether the circumstantial evidence
appearing of record and reasonable inferences therefrom were enough to support
conviction. Making this assessment is rendered a bit more difficult when, as here, the
drugs were not found on the accused's person or in areas within his exclusive control. In
all cases, the accused must be linked to the drugs. Establishing that link is quite easy
when the substances are found on his person for it is reasonable to infer that people know
what they have on their person. But, when the contraband is elsewhere or in a locale over
which the suspect does not have sole control, then the distance that is created in the link
must be bridged. In building that bridge, we consider numerous indicia or links. (1) 
Furthermore, each serves as a pillar, and there must be enough in place to span the gap
and tie the drugs to the accused. This does not mean that all the pillars must be in place. 
Evans v. State, supra. Rather, there need only be enough to make the jump. Or, in legal
jargon, the logical force emanating from the links must enable a jury to rationally infer,
beyond reasonable doubt, that the element of the crime in dispute existed. See id. (noting
that the logical force, or lack thereof, emanating from those links found to exist is
determinative). 

 The aforementioned indicia or links consist of such things as whether 1) the
accused was present when the search was conducted, 2) the contraband was plainly
visible by those present, 3) the drugs were near the defendant, 4) the defendant was under
the influence of the substance found, 5) the defendant possessed other contraband or drug
paraphernalia when arrested, 6) the defendant uttered any incriminating statements, 7) the
defendant attempted to flee or undertook other acts indicating a consciousness of guilt, 8)
the defendant made furtive gestures, 9) the contraband emitted a recognizable odor at the
time, 10) other contraband or drug paraphernalia was present, 11) the defendant had the
right to exclusive or joint possession of the locale at which the drugs were found, 12) the
place where the drugs were found was enclosed, 13) the amount of contraband
discovered, and 14) the accused was familiar or had experience with drugs. Evans v.
State, supra. By no means is this list exclusive; there may be others. But, again,
irrespective of which are used, the force of their sum at bar must have been enough to
lawfully permit the jury to infer (beyond reasonable doubt) that appellant knew of the drugs
he was transporting. 

 Application of Law 

 Record Evidence

 Viewing the record evidence, we note the following. The 30 pounds of marijuana
was divided into 22 packets and placed in one box. The packets were either lined or
sprinkled with lotion and pepper, set upon a pallet, and surrounded with sacks of corn flour. 
The sacks of flour, some individually wrapped in plastic and others wrapped in packets of
ten, covered not only the sides of the box but its top as well. Then, the pallet, along with
three others containing sacks of flour (wrapped in packets of ten) were loaded into the
trailer. Who wrapped the flour and stacked it on the pallets does not appear of record. Nor
does the record disclose whether or not the box was inserted before or after the pallets of
flour were loaded. One of the testifying officers (who had experience as a trucker) did
opine, though, that truck drivers do not load their cargo; others do it for them. And, this
testimony comports with that of appellant for he said he remained in the truck's sleeper unit
while third parties loaded the cargo. Yet, irrespective of who loaded the pallets of flour or
when the marijuana was hidden within it, whoever did so also placed cardboard atop each
pallet to cover it. 

 Next, to reach the flour, one of the arresting officers had to climb over two other
pallets. These contained sacks of charcoal also wrapped in plastic. Furthermore, the
charcoal was stacked high enough to leave only a small crawl space between it and the
trailer's roof. Additionally, both the pallets of charcoal and flour were placed at the front
of the trailer; so too did they fill only about a quarter of the available space. The remainder
of the trailer was empty. With the trailer being loaded in that manner and lacking internal
lights, the contents within it were not easily visible, according to an officer. 

 Of note was the testimony that flour and charcoal were "absorbents." Being such,
the officers opined that they (along with the lotion and pepper) can be used by drug
traffickers to mask odor which drugs may emit. This may be why neither officer could smell
the marijuana themselves. Instead, it took a drug dog to discover the scent. Yet, whether
charcoal and flour had the same absorbing properties when wrapped in plastic went
unaddressed. 

 According to the record, the officers first encountered appellant as he drove the
eighteen wheeler from California down I-40 and through Wheeler County. According to
them, he owned the truck tractor while someone named Ramos owned the trailer. 
Furthermore, he had been given the job of transporting several cars from California back
to his home state of North Carolina. Because the cars were not ready for transport when
appellant arrived in California, he was directed to pick up other loads, those loads being
the corn flour and charcoal in question. 

 As appellant purportedly made his way back to North Carolina, an officer stopped
him as part of a routine inspection. During the stop, appellant gave the officer two
documents representing the contents of his trailer. One (pertaining to the charcoal) was
a form bill of lading the blanks of which having been completed in handwriting. The other
(pertaining to the flour) was an electronically printed cash receipt. They both had the
name, street address and phone number of the business at which the particular commodity
was acquired. (2) The appearance of the bill of lading seemed odd to the officer since he
opined that most were now completed electronically. Yet, he admitted that there was
nothing illegal in a bill being completed by hand. So too was the receipt deemed odd,
given that it did not appear to be a bill of lading but rather a cash sales receipt. According
to the officer, cargo was generally paid for via credit not cash. Nevertheless, no one
opined that it was illegal to acquire cargo that had been paid for in cash. Nor did either of
the testifying officers opine that appellant was the one who actually paid for the corn flour
or that he ever had an amount of money on him sufficient to pay for it. They simply
concluded that someone had to pay for it. 

 Though an officer made effort, at one time or another, to verify the identity of the
name of the contact person (Juan) mentioned on both documents, he met with little
success. He did talk with people at the establishments but his attempt to fax the
documents to them per their request went for naught; the fax numbers purportedly were
inoperative. And, his subsequent phone calls either went unanswered or resulted in a busy
signal. 

 That appellant's signature appeared on neither the bill nor receipt was another
cause for concern mentioned by at least one officer. He opined that truck drivers usually
sign such documents upon receiving the cargo. 

 As for the conduct of appellant during the stop and ensuing search, both officers
stated that he was cooperative and calm. He answered their questions, consented to a
search of the vehicle, and voluntarily unlocked the cargo doors to permit it. Furthermore,
when the drugs were ultimately discovered appellant revealed no marked change in his
demeanor, according to one officer. The other, however, contradicted this testimony by
describing that appellant acted in "disbelief." How this supposed disbelief was evinced
went unmentioned. So too did this officer opine that acting in disbelief is often an attempt
to mask guilt, but, he did not say how he interpreted appellant's reaction. Nor did he
provide the jurors with any indicia which they could use to determine its sincerity. (3) 

 Next, after appellant authorized the officers to search the tractor and trailer, one
walked his drug dog around the vehicle. The animal "hit" twice. The first occurred as it
sniffed around a drain in the trailer. That drain was in the vicinity of the flour stored inside. 
The second "hit" occurred once the dog entered the trailer itself; it led to the discovery of
the box hidden within the flour. No other contraband was discovered in the trailer or truck,
though. Nor were drugs or drug paraphernalia found on appellant's person. And, when
asked, the officers disclosed that appellant did not appear to be under the influence of any
illegal substance. 

 As previously mentioned, the cargo filled only a small portion of the trailer. This led
one of the officers to wonder why appellant locked the cargo doors. He allegedly knew of
instances where more sizeable amounts of cargo where left behind unlocked doors when
being hauled around. Yet, the officer also opined that a truck "driver is responsible for the
load." And, another acknowledged that the doors may have been locked simply as a
security measure to protect the cargo. 

 Next, the size of the lawful cargo and the distance being traveled (from North
Carolina to California then back to North Carolina) caused an officer to wonder about the
profitability of the trek, and he mentioned this to the jury. Yet, nowhere in the record do we
find evidence that appellant's pay was dependent upon or linked to the quantum of
property hauled. Rather, it illustrates that he had leased the truck to another (Carlos
Ramos of Wilson, N.C.) in return for receiving a certain income based upon miles driven. 
In short, he was paid by the mile, not the load, and no one contested this. 

 That appellant had originally been sent to retrieve cars also seemed unusual to the
officers. This was so because the trailer was a refrigerated unit or "reefer," and they
purportedly were not designed to transport vehicles. Nonetheless, one officer conceded
that he had "seen . . . in the past" reefers being used for such purposes. Moreover, neither
officer addressed whether the unit being pulled by appellant was somehow modified to
allow the transportation of motorized vehicles. 

 Next, the topic of appellant's presence when the cargo was being loaded was
broached. One of the officers attested that he "believe[d]" appellant told him he (appellant)
was "present" during that time. The same officer later conceded to defense counsel that
appellant never "indicated where he was when these were loaded." The other officer
commented, though, that because truck drivers were "responsible" for the cargo, they
normally supervised its loading and signed the bills of lading. But, as previously
mentioned, he also opined that drivers were not responsible for packing the commodities
being shipped. So too did he acknowledge that a driver could simply back his trailer to the
loading dock, have others load it, receive a "cash ticket," and go "to the next place." The
latter likened to the method appellant indicated that he followed; again, he allegedly
remained inside his truck's sleeper while others placed the cargo in the trailer. 

 Next, an officer testified that appellant had approximately $700 on his person when
stopped. Whether this sum of money was unusual for a trucker driving cross-country went
undeveloped. Nonetheless, appellant informed the jury that he was given $1200 in
advance to pay for the expenses of the trip. Moreover, the State calculated, through a
witness, that the gas expense alone in going from North Carolina to California and then
back approximated $550 to $600. 

 Other evidence appearing of record consisted of an officer suggesting that appellant
failed to inform him of the flour shipment when asked about what he carried; allegedly
appellant simply mentioned the charcoal. Yet, a written report filed by the officer revealed
that appellant had indeed told him of both commodities before the search began. Next,
one or the other officer conceded that he found no indication of appellant being in the
trailer, that appellant's fingerprints were not found on the contraband, that appellant never
refused to talk with them, that appellant denied having narcotics or other contraband in the
vehicle, that there existed a language barrier between the officers and appellant, (4) that
appellant uttered no incriminating statements, and that appellant's travel log disclosed no
unusual stops. Finally, when asked to name the indicia he perceived that suggested
appellant knew about the drugs, the officer who initially detained and interrogated appellant
and eventually found the marijuana replied: "I guess I couldn't honestly answer that." 

 Comparison of the foregoing evidence to the links mentioned in Evans leads us to
the following observations. First, appellant was at the scene when the contraband was
discovered by the officers. Second, the contraband was not in plain view but hidden within
an enclosed space. Third, no one could place appellant on the loading dock or near the
cargo as it was being loaded. Fourth, appellant had access to the contraband given his
control over the trailer and possession of the keys for the lock on the cargo doors; yet,
nothing indicated that he was ever in the trailer. Fifth, though the contraband may have
been accessible by appellant through effort, no evidence indicates that it was ever within
close proximity to him. Sixth, while appellant carried a large sum of money on him, nothing
indicates that the sum was unusually large for a cross-country trucker to have while
performing his job. Seventh, to the extent that marijuana emitted an odor, it took a drug
dog to notice it. Eighth, neither drugs nor drug paraphernalia was found on appellant; nor
did he appear to be under the influence of any narcotic or contraband. Ninth, other than
the 30 pounds of marijuana hidden within the flour, no drugs were found elsewhere. Tenth,
appellant did not act nervous, though he may have evinced "disbelief" when the drugs were
discovered according to one of the two officers. Eleventh, appellant made no effort to
escape, committed no furtive gesture, nor uttered any conflicting or incriminating
statement. Twelfth, though the amount of contraband was rather sizeable, it nonetheless
was small enough to be hidden within a pallet of flour. Thirteenth, no one observed
appellant in a suspicious place under suspicious circumstances. Fourteenth, appellant
may have deviated, in some respects, from what the officers perceived to be normal
shipping procedures when acquiring his loads. Fifteenth, there was little profit to be made
in shipping the quantum of charcoal and flour discovered in the trailer. Sixteenth, though
the bill of lading and cash receipt were deemed suspect by the arresting officers, the
officers never determined whether they were issued by someone other than the companies
and individuals mentioned thereon. Seventeenth, there is no evidence that appellant had
any experience with drugs, knew what they looked like, or knew how they were shipped. 
Eighteenth, once appellant locked the trailer and left the loading docks, he had exclusive
control of its contents.

 Legal Sufficiency

 Given the foregoing litany, it appears that the links favoring the verdict are
appellant's relative accessibility to the contents of the trailer, his possession of $700, his
presence when the officers found the drugs, his potential deviation from procedures other
truckers may follow, the relative unprofitability of shipping the small amount of cargo, the
amount of the contraband hidden in a pallet of flour, and his exclusive control over the
freight once the trailer was locked and he left the loading docks. To them we add the
evidence that the entire cargo consisted of products having the purported ability to absorb
smells, that reefers were not designed to carry vehicles, that the officers had difficulty in
confirming the identity of the contact persons whereat appellant acquired his cargo, that
one could notice a difference in the way the flour on the pallet containing the marijuana
was packaged, and that appellant distanced himself from the cargo as it was loaded. 
When that evidence is construed in a light most favorable to the verdict and contradictory
evidence is ignored, we deem there is enough to bridge the gap between appellant and the
drugs. In other words, there was some evidence permitting a rational jury to conclude
beyond reasonable doubt that he not only exercised control over the marijuana (by hauling
across country) but did so knowing it was within his control. 

 Factual Sufficiency 

 Yet, our job is not over. Again, appellant questioned the factual sufficiency of the
evidence. And, as previously mentioned, addressing that issue obligates us to consider
the entirety of the evidence in a neutral light. Thus, we need not ignore the fact that the
officers were not qualified by the State as or otherwise shown to be experts on the matter
of commercial trucking procedures or the conduct of commercial truckers. Nor must we
ignore the fact that in commenting about the ability of charcoal and flour to absorb odors,
the officers were again not shown to have any specialized training in the matter. Nor can
it be forgotten that neither they nor the State explained what effect plastic wrapping had
on the ability of charcoal and flour to absorb smells. Moreover, in reading the testimony
of the officers, one is left with the unmistakable impression that whatever conduct a
suspect engages in, they can interpret it as indicative of criminality. To that we add 1) the
numerous links (discussed above) that weigh against there being a nexus between
appellant and the contraband, 2) one officer's own testimony that he has seen reefers
being used to haul cars, 3) another's testimony that a trucker may simply drive up to a
loading dock, remain in the truck, have others load the goods, obtain whatever receipt is
given him, and then drive off, 4) the inability of the officers to confirm whether or not the
contact person named on the bill of lading and receipt worked for the companies at which
the goods were received, 5) the lack of evidence suggesting that appellant had any
experience in or history with the drug trade, 6) the absence of evidence contradicting
appellant's version of how he came to acquire the limited cargo he had, and 7) the inability
of one officer to place appellant inside the trailer and of the other to inform the jury of any
indicia he thought was enough to show appellant knew of the drugs. 

 Into the mix we throw in another observation. The circumstances before us are
unlike those involved in the usual drug stop. We do not have an individual simply operating
a vehicle on a public roadway. We have a person whose job it is to transport, over long
distances, property belonging to third parties. Moreover, if the officers at bar are to be
believed, the property is most likely packaged by third parties, as opposed to the driver. 
This is a setting ripe for the unwitting carriage of illegal goods. Consequently, both jurors
and the judiciary must tread cautiously to avoid convicting the unwitting. 

 In sum, while an abundance of information floats around in the record it means little
when placed in context. It may be (as the officers suggested) the responsibility of a long-haul driver to exercise care over his cargo but not even the law of bailments equates the
duty of care with a knowledge of content. To say otherwise would be to divine apples from
oranges. And, that appears to be a general flaw running throughout the case. Tidbits of
information were tossed before the jury but there lacked a cohesive thread tying them
together. This is not to say that the State's effort was less than noteworthy. Rather, it
connotes the difficulty in proving guilt in cases such as this. 

 So, from the totality of the evidence when considered in a neutral light, we can say
that objective basis exists of record upon which to find "the evidence supporting conviction
[to be] so weak that the verdict "seems 'clearly wrong and manifestly unjust[.]'" Evans v.
State, supra. To the extent that the dissent disagrees, we note that the two cases it relies
on, Menchaca v. State, 901 S.W.2d 640 (Tex. App.-El Paso 1995, pet. ref'd) and United
States v. Garza, 990 F.2d 171, 174 (5th Cir. 1993), are inapposite. For instance, Menchaca
involved drugs being transported within a car as opposed to being hidden within the cargo
of a trailer hauled by a common carrier. Nor do we have here evidence of nervousness on
the part of the driver or a document indicating how and where the drug deal would be
completed, unlike the situation in Menchaca. As for Garza, the court also had before it
indicia absent here. They included 1) nervousness and trembling on the part of the
courier, 2) a false bill of lading hidden in the truck, 3) admission by the courier of
falsification of his log book along with an implausible explanation, 4) suspicious
circumstances involving Garza's delayed departure and 5) abandonment of his unlocked
truck for a time. But, most importantly, neither opinion dealt with the factual, as opposed
to legal, sufficiency of the evidence. This is of import because evidence that is legally
sufficient to support a verdict does not ipso facto mean it is factually sufficient. (5)

 Accordingly, we overrule appellant's issue regarding the legal sufficiency of the
evidence but sustain that involving the factual sufficiency of the evidence illustrating
appellant's knowledge of the contraband. So too do we reverse the judgment and remand
the cause for further proceedings.

 Brian Quinn 

 Chief Justice

 

Publish.
1. Though the indicia were once characterized as "affirmative links," we now simply refer to them as
links. Evans v. State, No. P.D.-1911-05, 2006 Tex. Crim. App. Lexis 1815 n.9 (Tex. Crim. App. September
20, 2006). 
2. An officer testified that no street address appeared on the corn flour receipt. One need only read
the document to see that he was mistaken. Furthermore, should the address be "googled," one would
discover that the address is tied to the business name appearing on the receipt. 
3. It is interesting how easily evidence of demeanor can be manipulated to mean just about anything. 
Some suggest that nervousness indicates guilt. Others find culpability in a suspect's calmness. Should he
cooperate with law enforcement or consent to a search, then that simply means (as one officer insinuated
here) he is setting himself up to later feign surprise and innocence. But, if the suspect were to be
uncooperative or refuse to permit a search, then he must be hiding something, some would say. Interesting,
indeed. 
4. Appellant was a resident of the United States from Guatemala and spoke Spanish.
5. This truism further illustrates the problem with the factual sufficiency analysis. While the evidence
being legally sufficient does not mean it is factually sufficient, the line between the two becomes more oblique
given such recent cases as Watson v. State, 204 S.W.3d 404 (Tex. Crim. App. 2006). Appellate courts are
informed that they are to play some role as a thirteenth juror but not really and that they must be highly
skeptical about the verdict, not just skeptical. So too must an objective basis be found before holding the
evidence factually sufficient, but whether the objectivity of the jurist when considering the evidence must be
that simply of a reasonable judge is unknown. And, if it is to be simply that of a reasonable judge, it cannot
really be said to differ much from that of the reasonable judge of the facts, i.e. a juror. So, maybe then, the
jurist's viewpoint should be that of the highly skeptical reasonable judge. As oft stated by a colleague
"whatever . . .!" In any case, it may be time for either the Court of Criminal Appeals or legislature to reconsider
the viability of the doctrine. Watson comes close to, but falls short of, doing away with it, and, instead, leaves
us with nebulous parameters to use in guiding our journey. Jurors should be left to do their job. And, if the
evidence legally supports what they did, then all should accept it.